## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DEVIN ENGLISH,<br><br>                              Plaintiff,<br><br>        v.<br><br>JEFFREY T. PARSONS-HIETIKKO; CHRIS HIETIKKO-PARSONS; MINDFUL DESIGNS; RESEARCH FOUNDATION OF THE CITY UNIVERSITY OF NEW YORK; BRIAN MUSTANSKI; JARRET THOMPSON; JARRET THOMPSON CONSULTING; SYLVIE NAAR,<br><br>                              Defendants. | CIVIL ACTION NO. 19-cv-_____<br><br>**FILED IN CAMERA AND UNDER SEAL**<br><br>**DO <u>NOT</u> PLACE ON PACER**<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

By:     _Sean Hecker_ _____

Sean Hecker
Jenna M. Dabbs
Benjamin D. White
Alexandra K. Conlon (*admission pending*)
KAPLAN, HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York  10118
(212) 763-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
bwhite@kaplanhecker.com
aconlon@kaplanhecker.com

*Qui tam* Relator Dr. Devin English, on behalf of the United States of America pursuant to the procedures of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, alleges as follows:

### INTRODUCTION

1.      This case centers on a once well-regarded research professor's long-running theft of federal money earmarked for groundbreaking HIV/AIDS research and the prestigious research foundation that allowed it to happen.

2.      For years, Defendant Dr. Jeffrey T. Parsons-Hietikko ("Parsons"), at the time a Distinguished Professor at Hunter College in New York, used his control and influence as the Director of Hunter's Center for HIV Educational Studies ("CHEST") to secretly siphon grant funds awarded for important scientific research by the National Institutes of Health ("NIH"), and managed and overseen by Defendant Research Foundation of the City University of New York ("RFCUNY"), for his own benefit and to bankroll his lavish lifestyle.  This suit aims to return Parsons's ill-gotten gains—and those of his conspirators—to the public fisc where they belong.

3.      Central to Parsons's scheme was a purported graphic design company, Defendant Mindful Designs, that was co-owned by Parsons's husband Defendant Chris Hietikko-Parsons ("Hietikko") and Parsons. Through a web of separate but interrelated schemes, principally using Mindful Designs as a vehicle, Parsons steal a significant amount of NIH funds.

4.      *First*, Parsons hid his ownership of Mindful Designs all while it was raking in hundreds-of-thousands of dollars from NIH grants. *Second*, Parsons had Mindful Designs invoice NIH grants for wildly excessive fees for work that was unnecessary or that it didn't even do. *Third*, Parsons invoiced labor so that NIH funds were expended for work not performed in furtherance of NIH grants.  And *fourth*, Parsons incurred fraudulent, unnecessary, and extravagant expenses that he invoiced (and often double or even triple invoiced) to NIH grants.

5.      Parsons was able to accomplish this theft under the supposed watch of RFCUNY, which was specifically required by NIH rules and regulations to detect, monitor, manage, and mitigate the financial conflicts of interests of its researchers, including Parsons. But, at best, RFCUNY deliberately ignored Parsons's fraud; at worst, RFCUNY was fully aware of Parsons's fraud and condoned it.

6.      And Parsons did not act alone.  In defrauding the government, Parsons was actively aided by his husband, Hietikko, and their co-owned vehicle for fraud, Mindful Designs.  Further, Parsons conspired with researchers at other universities—close personal friends of Parsons and Hietikko—who orchestrated nearly identical schemes at their own universities.  Specifically, Defendant Brian Mustanski of Northwestern University orchestrated a nearly identical scheme with his husband Defendant Jarret Thompson, using as their fraud vehicle, Defendant Jarret Thompson Consulting.  And Defendant Sylvie Naar of Florida State University did the same with her company, Behavior Change Consulting.

7.      And not only did Parsons, Mustanski, and Narr orchestrate their own separate schemes at their own universities, they also conspired with each other in a you-steal-from-my-grants-I-steal-from-yours scheme in which they entered into lucrative—and bogus—agreements with each other's respective contractors.

8.      Relator brings this *qui tam* action on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), to recover treble the damages actually sustained by, and civil penalties owed to, the United States as a result of Defendants' fraud.

9.      As these terms are defined in the False Claims Act, the allegations that follow have not been "publicly disclosed," and, regardless, the Relator "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A).

10.     This Complaint has been filed *in camera* and under seal in compliance with 31 U.S.C. § 3730(b)(2).  It will not be served on Defendants unless and until the Court so orders.

## THE PARTIES

11.     Plaintiff the United States of America, acting through the Department of Health and Human Services (more specifically the National Institutes of Health), brings this action by and through Relator Dr. Devin English (the "Relator").

12.     Relator is a citizen of the United States and, at all relevant times, has been a resident and citizen of New York.  From September 2017 to August 2019, Relator was a postdoctoral researcher at CHEST and worked with Parsons regularly from September 2017 until Parsons was placed on administrative leave in May 2018.

13.     Defendant Parsons was a Distinguished Professor, instructor, and researcher employed by Hunter College until July 2019, having stepped down as the Director of CHEST in May 2018 when he was placed on administrative leave.  By virtue of his position, Parsons had ultimate responsibility for grant management at CHEST at all relevant times.  Parsons is also the co-owner and founder of Defendant Mindful Designs.

14.     Defendant Hietikko is Parsons's husband and the co-owner of Mindful Designs.

15.     Defendant Mindful Designs is a partnership or LLC with a permanent legal address of 791 Salem Street, Teaneck, NJ 07666, the home address of both Parsons and Hietikko.  Mindful Designs is co-owned by its two partners, Parsons and Hietikko, and promotes itself as a graphic design company targeted specifically to academic researchers.  Parsons is the founder and principal of Mindful Designs.

16.     Defendant RFCUNY is a private non-profit corporation that supports the staff of the City University of New York ("CUNY") and its constituent entities in securing and administering research grant awards.

-4-

17.     Defendant Mustanski is the Director of the Institute for Sexual and Gender Minority Health and Wellbeing at Northwestern University, as well as the Co-Director of the NIH Third Coast Center for AIDS Research, and Co-Director of the National Institute on Drug Abuse ("NIDA") Center for Prevention Implementation Methodology.  He also serves as the 2019 President of the International Academy of Sex Research.

18.     Defendant Thompson is Mustanski's husband and the owner of Jarret Thompson Consulting.

19.     Defendant Jarret Thompson Consulting, at other times known as J. Thompson Group, Inc., is, on information and belief, a company (at least partly) owned by Jarret Thompson, who is also its principal, and is located in Chicago, IL.

20.     Defendant Naar is a Distinguished Endowed Professor in Behavioral Health at Florida State University ("FSU") Medical School's Department of Behavioral Sciences and Social Medicine and the head of FSU's Center for Translational Behavioral Research.  Prior to her recent appointment at FSU in January 2018, Naar was a professor at Wayne State University and the director of the Division of Behavioral Sciences there. Naar is the founder of a company called Behavior Change Consulting and was once its owner.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action is brought for violations of the False Claims Act, a federal statute.

22.     This Court has personal jurisdiction over Defendants because each Defendant resides, does business, and/or carried out their fraudulent scheme in the United States, and, more specifically, New York.

23.     Venue is proper under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the Defendants are located in, are licensed to do business in, and/or transact or have transacted

business in this District, and the events or omissions that give rise to these claims have occurred in this District.

**FACTUAL ALLEGATIONS**

## I.     National Institutes of Health

24.     The National Institutes of Health ("NIH") is the primary U.S. government agency responsible for biomedical and public health research.  NIH is part of the United States Department of Health and Human Services ("HHS") and has an annual budget of over $37,000,000,000.  NIH's mission is "to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability."[1]  NIH furthers its mission by awarding more than 80% of its annual budget "each year to support investigators at more than 2,500 universities, medical schools, and other research organizations around the world."[2]

### A.     NIH Grants

25.     NIH is comprised of twenty-seven (27) institutes and centers (known as "ICs"), twenty-four (24) of which issue grant awards to highly-qualified applicants seeking to conduct mission-furthering research.  "Each IC has a separate appropriation from Congress, and the director of each IC decides which grants it will fund, taking into consideration input from their staff, the results of the scientific peer review of the grant application, public health need, scientific opportunity, and the need to balance its scientific portfolio.  NIH only funds research that has been judged highly meritorious in the peer review process."[3]

---

[1] https://www.nih.gov/about-nih/what-we-do/mission-goals.

[2] https://grants.nih.gov/grants/understanding-nih.htm.

[3] https://grants.nih.gov/grants/understanding-nih.htm.

26.    NIH has hundreds of individual grant programs.  Its most common grant program, for example, is the NIH Research Project Grant Program, known as "R01."  An R01 "grant is an award made to support a discrete, specified, circumscribed project to be performed by the named investigator(s) in an area representing the investigator's specific interest and competencies, based on the mission of the NIH."[4]

### B.    NIH Rules and Regulations on Financial Conflicts of Interest

27.    NIH's rules and regulations carefully circumscribe how institutions that receive grants, and investigators that undertake research pursuant to those grants, must deal with financial conflicts of interests ("FCOIs").  *See*  42 C.F.R. 50, Subpart F.   The rules exist to "provide a reasonable expectation that the design, conduct, and reporting of research funded under [NIH] grants . . . will be free from bias resulting from Investigator financial conflicts of interest."  42 C.F.R. § 50.601.  The rules apply to each "Institution" that receives NIH research grants as well as "to each Investigator who is planning to participate in, or is participating in, such research."  42 C.F.R. § 50.602.

28.    The regulations require that each Institution impose rigorous requirements on Investigators as to FCOIs, designating the Institution as the gatekeeper to identify and mitigate FCOIs.

29.    Each Institution must "[r]equire that each Investigator who is planning to participate in the [NIH]-funded research disclose to the Institution's designated official(s) the Investigator's significant financial interests (and those of the Investigator's spouse and dependent children) no later than the time of application."  42 C.F.R. § 50.604(e)(1).

---

[4] https://grants.nih.gov/grants/funding/r01.htm.

30.     Each Institution must also "[r]equire each Investigator who is participating in the [NIH]-funded research to submit an updated disclosure of significant financial interests at least annually. . . .  Such disclosure shall include any information that was not disclosed initially to the Institution pursuant to paragraph (e)(1) of this subsection, or in a subsequent disclosure of significant financial interests . . . and shall include updated information regarding any previously disclosed significant financial interest." 42 C.F.R. § 50.604(e)(2).

31.     A "significant financial interest exists if the value of any remuneration received from the entity in the twelve months preceding the disclosure, when aggregated, exceeds $5,000, or when the Investigator (or the Investigator's spouse or dependent children) holds any equity interest."  42 C.F.R. § 50.603(1)(ii).  And, a "financial conflict of interest exists when the Institution, through its designated official(s), reasonably determines that the significant financial interest could directly and significantly affect the design, conduct, or reporting of the [NIH]-funded research." 42 C.F.R. § 50.604(f).

32.     To ensure that Institutions are able to fulfill their gatekeeping function, the regulatory scheme requires each Institution that receives grants to establish a robust system of procedures regarding FCOI. *See* 42 C.F.R. § 50.604(a). Each Institution is required to "[e]stablish adequate enforcement mechanisms and provide for employee sanctions or other administrative actions to ensure Investigator compliance as appropriate." 42 C.F.R. § 50.604(j).  In so doing, each Institution is required to "[p]rovide initial and ongoing FCOI reports to [NIH]." 42 C.F.R. § 50.604(h). Each Institution is thus required to certify to NIH in each application that it will have in effect an FCOI policy, that it will "promote and enforce Investigator compliance" with the FCOI rules, and will "manage financial conflicts of interest and provide initial and ongoing FCOI reports to [NIH]." 42 C.F.R. § 50.604(k).

33.     NIH regulations also require each Institution, upon determining that an FCOI exists, to "develop and implement a management plan that shall specify the actions that have been, and shall be, taken to manage such financial conflict of interest." 42 C.F.R. § 50.605(a). Where an Institution discovers that an FCOI was not disclosed by an Investigator, it must, "within 120 days of the Institution's determination of noncompliance, complete a retrospective review of the Investigator's activities and the [NIH]-funded research project to determine whether any [NIH]-funded research, or portion thereof, conducted during the time period of the noncompliance, was biased in the design, conduct, or reporting of such research." 42 C.F.R. § 50.605(ii)(A). Further, the Institution is required in most instances to "ensure public accessibility . . . of information concerning any significant financial interest disclosed to the Institution." 42 C.F.R. § 50.605. This includes posting FCOIs to a publicly-available website.

34.     Not only must Institutions publicly disclose FCOIs, they are also required to comprehensively report those FCOIs to NIH. Specifically, such FCOI reports must "include sufficient information to enable [NIH] to understand the nature and extent of the financial conflict, and to assess the appropriateness of the Institution's management plan." 42 C.F.R. § 50.605(b)(3).[5]

35.     NIH regulations contain detailed remedies for Institutions or Investigators that are not in compliance with FCOI rules, which includes the "imposition of specific award conditions under 45 CFR 75.207, or suspension of funding or other enforcement action under 45 CFR 75.371." 42 C.F.R. § 50.606(b). Specifically, the remedies for noncompliance outlined in 45 C.F.R. § 75.371 include, but are not limited to, disallowing costs of the activity that is not in compliance or terminating the award entirely.

---

[5] https://grants.nih.gov/grants/policy/coi/coi_faqs.htm#3392.

### C.      NIH Rules and Regulations on Allowability of Costs Incurred on Grants

36.      NIH rules also contain several "cost principles [that] apply to all NIH award instruments."[6] At their most basic, these rules make grant recipients "responsible for the efficient and effective administration of the Federal award through the application of sound management practices." 45 C.F.R. § 75.400(a).

37.      Perhaps the most significant such principle is that all costs that grant recipients incur must "[b]e necessary and reasonable for the performance of the Federal award." 45 C.F.R. § 75.403(a). The regulations contain detailed requirements for whether a cost is "reasonable." "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when the non-Federal entity is predominantly federally funded." 45 C.F.R. § 75.404. There are five factors a grant recipient must consider when determining whether a given cost is "reasonable":

     a.      "Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award." 45 C.F.R. § 75.404(a).

     b.      "The restraints or requirements imposed by such factors as: Sound business practices, arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award." 45 C.F.R. § 75.404(b).

     c.      "Market prices for comparable goods or services for the geographic area." 45 C.F.R. § 75.404(c).

     d.      "Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the non-Federal entity, its employees, where applicable its students or membership, the public at large, and the Federal Government." 45 C.F.R. § 75.404(d).

---

[6] https://grants.nih.gov/grants/policy/nihgps/html5/section_7/7.2_the_cost_principles.htm.

e.   "Whether the non-Federal entity significantly deviates from its established practices and policies regarding the incurrence of costs, which may unjustifiably increase the Federal award's cost." 45 C.F.R. § 75.404(e).

38.   NIH rules also require that all costs (i) be "allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with the relative benefits received," 45 C.F.R. § 75.405(a); (ii) "[c]onform to any limitations or exclusions set forth in these [cost] principles or in the Federal award as to types or amount of cost items," 45 C.F.R. § 75.403(b); and (iii) "[b]e accorded consistent treatment," 45 C.F.R. § 75.403(d).

## II.   The Center for HIV/AIDS Educational Studies and Training (CHEST)

39.   In existence between 1996–2019, CHEST was an academic research center that was part of Hunter College, one of the eleven senior colleges that are part of CUNY.  CHEST was founded by Parsons in 1996 as a small lab, but by 2018 it had grown significantly and had approximately 56 employees.

40.   CHEST's mission was to "conduct research to identify and promote strategies that prevent the spread of HIV and improve the lives of people living with HIV."[7]  In particular, CHEST produced research that primarily focused on the prevention of HIV among gay, bisexual, and other men by reducing substance use and sexual risk.  As described by Parsons: "From the beginning, CHEST research has allowed health professionals to understand, and government policy makers to act, on intervention strategies covering a whole range of critical health issues, from HIV testing to treatment adherence.  The long battle to combat HIV/AIDS has been enormously successful, but as statistics show, the war is not over.  Further research remains vital to creating and implementing new policies, and to continue reducing infection rates.  Yet dialogues

---

[7] http://www.cunyhpcs.org/uploads/8/2/6/8/82688894/press_release_moody.pdf; https://chestnyc.tumblr.com/.

between researchers, policy makers, and community HIV and LGBT health workers remains [*sic*] rare."[8]

41.     CHEST was part of Hunter College but its research funding was administered by RFCUNY, "a not-for-profit educational corporation chartered by the State of New York in 1963."[9] "RFCUNY supports CUNY faculty and staff in identifying and obtaining external support (pre-award) from government and private sponsors and is responsible for the administration of all such funded programs (post-award)."[10]

42.     Throughout its existence, approximately ninety-five (95) percent of CHEST's funding came from grants awarded by NIH and administered by RFCUNY.  RFCUNY promotes itself as the entity that "stands between CUNY's principal investigators (PIs) and the sponsors who support them," and it takes responsibility for nearly all issues related to grants awarded to CUNY colleges and schools, including Hunter (and, by extension, CHEST).[11]  This includes "managing nearly 4,000 active sponsored projects . . . from inception to completion," being "responsible for payments of all goods and services principal investigators (PIs) need to carry out the purposes of their sponsored research," and conducting internal audits "to test controls that ensure efficiency, effectiveness, and adherence to established rules and regulations."[12]

43.     In mid-2019, CHEST was shut down following allegations that Parsons violated CUNY's Drug and Alcohol Policy and CUNY's policies on sexual misconduct on numerous

---

[8] https://www1.cuny.edu/mu/forum/2016/09/14/hunter-college-center-for-hivaids-research-chest-to-commemorate-20th-anniversary-with-major-conference/.

[9] https://www.rfcuny.org/RFWebsite/about/company-overview/.

[10] https://www.rfcuny.org/RFWebsite/about/company-overview/.

[11] https://www.rfcuny.org/RFWebsite/about/company-overview/.

[12] https://www.rfcuny.org/RFWebsite/about/company-overview/.

occasions.[13]   In its place, Hunter College established a new research institution known as the Promoting Resilience, Intersectionality, Diversity, and Equity ("PRIDE") Health Research Consortium.

44.     Parsons was the Principal Investigator on almost all grants issued to CHEST (until being placed on administrative leave in May 2018) and had responsibility not just for managing grants, but also for applying for new ones and interacting with RFCUNY as the host institution.

## III.   Parsons

45.     Parsons was the youngest-ever Distinguished Professor at Hunter College and was the fifth-highest paid professor at CUNY.  Parsons wielded considerable influence in his field, which included his role as the editor or deputy editor of three prominent journals and as a reviewer for over fifteen journals.  Parsons also led grant review panels at NIH, a distinction reserved for a select few.

46.     Parsons's research career took off in the early 1990s with an NIH grant to study hemophilia/HIV, and he thereafter moved on to studying HIV in gay men.  Parsons then founded CHEST in 1996 with a goal of "conduct[ing] research on social and psychological factors associated with HIV transmission and the wellbeing of those living with HIV, with a particular emphasis on the promotion of sexual health."[14]

47.     CHEST's research projects were mostly funded through R01 NIH research grants. On information and belief, during his time at CHEST, between 1996–2018, Parsons received more than $55,000,000 in funds from the NIH as an investigator.

---

[13] https://nypost.com/2019/07/13/esteemed-cuny-prof-quits-after-allegations-of-cocaine-binges-and-out-of-control-parties/.

[14] http://www.chestnyc.org/about-mission.html.

48.     On July 3, 2019, Parsons resigned from his position at Hunter College (and therefore CHEST) following accusations that he was "snorting cocaine at school events and throwing annual bashes that grew from low-key pizza parties into binge-drinking and go-go-boy bacchanals."[15]

## IV.     Parsons's Wide-Ranging Theft and Fraud

49.     Despite the extensive research that Parsons oversaw, throughout his time at CHEST, Parsons stole a significant amount of federal funds allocated to NIH grants through a set of schemes that grew in complexity and scope as his tenure as CHEST Director progressed.  At first, as Parsons tested the waters, Parsons's schemes involved small sums.  Over time, however, Parsons's schemes evolved into a large and multi-faceted fraud that, on information and belief, resulted in his pocketing over 1.5 million in taxpayer dollars earmarked for HIV/AIDS research.

50.     In short, Parsons took nearly every opportunity to steal NIH funds.  At present, Relator has evidence of at least four separate schemes employed by Parsons to steal NIH grant money.   Although Relator identifies these as four distinct schemes, the schemes are often interrelated, and, there is reason to believe that Parsons's (and his co-conspirators's) fraud is broader and more widespread than the allegations contained in this pleading.

    a.     <u>Scheme 1</u>: Parsons contracted with Mindful Designs, a graphic design company that he owned, to do hundreds-of-thousands of dollars of NIH-funded work for CHEST, all while concealing his ownership interest.

    b.     <u>Scheme 2</u>: Parsons invoiced his NIH grants for wildly excessive fees purportedly incurred by Mindful Designs for work that was either unnecessary and/or not performed.

    c.     <u>Scheme 3</u>: Parsons fraudulently invoiced labor so that NIH funds were expended for work that was not performed on NIH grants.

---

[15] https://nypost.com/2019/07/13/esteemed-cuny-prof-quits-after-allegations-of-cocaine-binges-and-out-of-control-parties/.

-14-

      d.    <u>Scheme 4</u>: Parsons incurred fraudulent, unnecessary, and extravagant expenses that he charged to his NIH grants.

**A.    <u>Scheme 1</u>: Parsons Contracted with Mindful Designs, a Graphic Design Company that He Owned, to do Hundreds-of-Thousands of Dollars of NIH-Funded Work for CHEST, All While Concealing His Ownership Interest.**

51.    In 2011, Parsons founded a graphic design company named Mindful Designs with his husband Hietikko.  According to Hietikko's personal website, Mindful Designs is a graphics and visual design company that offers services "targeted specifically for academic researchers."[16] But Mindful Designs was a front.  It did nearly all of its work for CHEST and was little more than a vehicle through which Parsons and Hietikko fraudulently siphoned large sums of NIH grant money into their own pockets.  During Parsons's tenure at Hunter College, Parsons used his dual position as CHEST Director and as owner of Mindful Designs to get staff members within CHEST, and friends at other universities, to hire Mindful Designs on NIH grants for a vast array of projects.

52.    In total, Mindful Designs received approximately $656,000 in NIH funds for purported graphic design work it did for CHEST.  The amount of NIH funding allocated to Mindful Designs grew substantially over time, ultimately leading to figures that were facially unreasonable given the purported scope of graphic design work it was undertaking on behalf of CHEST (purportedly in furtherance of its research mission). For example, in 2011, Mindful Designs earned $19,000 in CHEST funds. In 2017, Mindful Designs was paid $98,050 in CHEST funds, but in 2018, Mindful Designs was paid $141,000 in CHEST funds *by May* (when Parsons was placed on administrative leave).

53.    To get away with directing NIH grant funds to a company that he founded and owned, Parsons did not disclose his ownership of Mindful Designs in forms he submitted to

---

[16] https://chrishietikko.com/graphic-designer/mindful-designs/.

RFCUNY (and that he knew NIH would ultimately rely upon). Throughout his tenure as CHEST Director, Parsons repeatedly submitted annual conflict of interest forms to RFCUNY that failed to disclose Parsons's role as owner of Mindful Designs. Specifically, Parsons annually omitted his ownership roles on an RFCUNY form titled "Request for Authorization to Retain the Services of an Independent Contractor $5,000 and Above."

54.     On one such form for the year 2018, for example, Parsons listed the Contractor's name as "Mindful Designs," and noted that the agreement was for $465,400. The form asked: "Is the contractor a full-time CUNY employee?" The form then had a checkbox for "Yes," and a checkbox for "No," and indicated "If 'Yes', please attach appropriate CUNY approval." Parsons falsely responded "No," even though he was in fact a CUNY employee. Parsons similarly falsely omitted his ownership role on RFCUNY forms that he submitted for the years 2012, 2013, 2014, 2015, 2016, and 2017. Despite the fact that certain (although not all) of those forms (unlike the 2018 form) mentioned Parsons's husband Hietikko, the forms were entirely silent as to the fact that Parsons was at the time a co-owner of Mindful Designs.

55.     Parsons also hid his ownership of Mindful Designs on other forms, including on dozens of RFCUNY payment request forms in which Mindful Designs directly invoiced RFCUNY in its own name without mentioning Parsons (or Hietikko). For just two examples: (i) on January 23, 2014, Parsons submitted a payment request form to RFCUNY in the amount of $11,500 and falsely responded "No," to questions asking whether Mindful Designs was an "RF/CUNY Employee" or "CUNY Faculty"; and (ii) on September 12, 2012, Parsons had done the same in the amount of $12,800.

56.     Parsons knew that NIH would rely—and ultimately did rely—on each of the forms identified above through, for example, RFCUNY's certification of compliance with NIH's FCOI rules per the NIH regulations identified above.

57.     Despite Parsons's knowing failure to disclose his status as an owner of Mindful Designs on forms he knew NIH would rely upon, Parsons elsewhere fully acknowledged his ownership stake in the company in situations in which there was no conflict of interest (*i.e.*, where Parsons had no reason to conceal his ownership). Several illustrative examples follow:

    a.    On July 17, 2012, Parsons signed a contract with the Center for Innovative Public Health Research in which he signed on behalf of Mindful Designs and listed his title as "Co-Owner."

    b.    On a March 27, 2013 invoice that Parsons sent to Mustanski at Northwestern University, Parsons identified himself as the "founder of Mindful Designs."

    c.    On February 2, 2018, Parsons signed on behalf of Mindful Designs a contract with Children's Hospital of Los Angeles.

58.     After intentionally omitting his ownership of Mindful Designs on forms that were submitted to RFCUNY (and that NIH relied upon), Parsons then caused hundreds of invoices to be issued from Mindful Designs to RFCUNY which were ultimately paid out to Mindful Designs (*i.e.*, himself) using NIH grant funds.

59.     To further cover his tracks, Parsons did not identify himself on the Mindful Designs's invoices as the CHEST employee that was billing the NIH grants for Mindful Designs's services. Rather, Parsons issued each invoice in the name of one of his CHEST employees, but he did so without their knowledge or consent. Indeed, between October 4, 2011 and April 30, 2018, Parsons submitted at least seventy-one (71) invoices to RFCUNY for work purportedly done by Mindful Designs (totaling expenditures of over $450,000) in the names of individuals other than himself. Relator has personal knowledge that many of the individuals that Parsons listed on

Mindful Designs's invoices, that were thereafter submitted to RFCUNY (and subsequently paid with NIH funds), were not aware that Parsons was using their names to bill for Mindful Designs's services.

**B.      Scheme 2:    Parsons Invoiced His NIH Grants for Wildly Excessive Fees Purportedly Incurred by Mindful Designs for Work That Was Either Unnecessary and/or Not Performed.**

60.      In addition to the fraudulent practice of directing work to Mindful Designs without disclosing his ownership thereof, Parsons also directed grant funds to Mindful Designs for work that was either wholly unnecessary or was not performed. On information and belief, these were NIH funds.

61.      The most egregious example relates to what was known as the Gay Men's Behavioral Science ("GMBS") Conference.

62.      Parsons hosted the GMBS Conference with Mustanski in San Juan, Puerto Rico in 2012 and 2014, and in Puerto Vallarta, Mexico in 2016 and 2018.  Parsons (and Mustanski) took advantage of these Conferences to unlawfully steer vast sums of NIH funds to himself, principally by hiring Mindful Designs to purportedly do work for the Conference.

63.      For the 2012 GMBS Conference, for example, the principal piece of work performed was the conference's brochure.  But, the core design element of that work appears to be a widely-available stock photo accessible via a simple Google Image search.

64.      In addition, Mindful Designs made minimal and superficial changes in the brochure it would use for subsequent conferences, yet still significantly *increased* the associated costs that it charged.  For example, Mindful Designs invoiced a total of $4,000 for the 2012 version of the brochure and a total of $12,000 for the nearly identical 2014 version.

65.     Not only was the work that Mindful Designs undertook for the GMBS Conferences worth significantly less than the amounts that Mindful Designs invoiced, Parsons then double (and sometimes triple) billed NIH grants for those services.

66.     For example, Parsons directed Mindful Designs to submit two separate invoices to CHEST for the 2012 GMBS Conference both in the amount of $2,000 for nearly identical work, one on October 26, 2011 and another on January 21, 2012.  Further, on both of the invoices for the 2012 GMBS Conference, Parsons had Mindful Designs bill the invoices to Chris Murphy at CHEST, a CHEST employee who did not attend the conference, instead of Parsons, even though it was Parsons who was the co-host of the conference commissioning the work.

67.     Parsons repeated this scheme for the 2014 GMBS Conference, although this time he had Mindful Designs twice invoice RFCUNY $3,500 (an increase from $2,000 from the 2012 Conference) for again nearly identical work, once on August 29, 2013 and again on January 23, 2014.  Parsons again caused these two invoices to be directed to Chris Murphy.  Further, Mindful Designs also issued a *third* invoice for the same described work, this time to Parsons's co-host Mustanski of Northwestern University in the amount of $5,000, bringing the total charged on work done for the 2014 GMBS Conference to an unjustifiable and facially unreasonable $12,000.

68.     Parsons largely repeated this same triple billing scheme for the 2016 GMBS Conference.  He directed two Mindful Designs invoices to CHEST (both in the name of Chris Murphy) on January 20, 2016 and March 29, 2016, and directed another invoice to Northwestern, on information and belief, on January 25, 2016.  Parsons also yet again significantly increased the price of Mindful Designs's services, charging a total of $15,500, $10,000 of which was charged to CHEST.

69.     Parsons repeated this billing scheme for the 2018 GMBS Conference.  On April 30, 2018, Parsons directed a Mindful Designs invoice to CHEST in the name of Carlos Ponton for $5,000.  On that same day, Parsons had Mindful Designs invoice Northwestern for the same work for $4,500.

70.     In addition to the duplicative billing and overcharging for work purportedly undertaken for the GMBS Conferences, Relator is aware of several other examples of excessive fees being paid to Mindful Designs.

       a.     Mindful Designs invoiced CHEST more than $44,000 over a six-year period for basic head shots of employees, for which it charged $300-$350 per photograph.

       b.     Mindful Designs invoiced CHEST $2,000 on September 11, 2012 for a photograph of the opening party for CHEST's new office.

       c.     Mindful Designs invoiced CHEST at least $7,730 for the purchase of studio equipment between December 18, 2016 and January 15, 2017.  On information and belief, Mindful Designs retains possession of this equipment and uses it for its own profit.

       d.     Mindful Designs invoiced Professor Michael Newcomb of Northwestern University, the Principal Investigator on what is known as the "2gether" grant (an NIH grant), at least $34,958.75 for four days of consulting and one video shoot from Hietikko.

71.     Relator has personal knowledge that the work performed by Mindful Designs was worth significantly less than the amounts Mindful Designs invoiced to CHEST (and other NIH-funded programs).  For example, CHEST stopped contracting with Mindful Designs after Parsons

resigned in 2018, and all graphics that would previously have been created by Mindful Designs at significant costs were created by CHEST staff and/or graduate students at minimal cost.

C.     **Scheme 3: Parsons Fraudulently Invoiced Labor So That NIH Funds Were Expended for Work That Was Not Performed on NIH Grants.**

72.     In addition to relying on Mindful Designs to purportedly perform work on Parsons's NIH-funded CHEST grants, Parsons also secured consulting arrangements for Mindful Designs with other universities.  Through these consulting arrangements, Parsons committed several interrelated frauds that stole funds from NIH grants and siphoned them to Mindful Designs for his personal benefit.

73.     For one, Parsons relied on the labor of CHEST employees—whose salaries were funded by NIH grants for specific, distinct projects—to do work for Mindful Designs on non-CHEST grants at other universities.  Parsons did not tell the CHEST employees that they were doing work for a Mindful Designs contract funded through a grant issued to another university, nor were CHEST employees permitted to do such work because all of their time was being billed to and paid for by CHEST's NIH grants.

74.     For example, Parsons entered into a consulting contract for Mindful Designs with Oregon Health Sciences University ("OHSU") on NIH Grant # R01AG053081.  Beginning in March 2016, Mindful Designs invoiced OHSU $65,900 for consulting and coding work purportedly completed by Parsons on that grant.  However, at Parsons's direction, CHEST employees performed the actual coding work (while being unaware that the work was being done on a non-CHEST grant or subaward) and their labor was charged to the NIH-funded grants at CHEST. The upshot of this scheme was that OHSU paid Mindful Designs for work completed not by Mindful Designs but by CHEST staff at the expense of NIH's other grants.

75.     To obscure that he was using CHEST labor on non-CHEST grants, Parsons doctored CHEST's labor hours submissions on a monthly basis for a number of years so that they indicated that the CHEST employees were working on CHEST grants for which they never actually performed any work.  For example, in February 2018, Parsons reported to RFCUNY that Relator spent 10% of his salaried labor working for a grant awarded by the National Institute of Child Health and Human Development (NIH Grant # U19HD089875).  The grant was awarded to study the manner in which adolescents manage HIV/AIDS issues.  But, Relator never worked on that grant, in February 2018 or otherwise.  Parsons's claim that he did was false and was done solely to effectuate his scheme to bill his NIH-funded CHEST grants for the labor invoiced to outside universities for work purportedly done by Mindful Designs.  For the avoidance of doubt, Relator had no knowledge that Parsons billed his time to Grant No. U19HD089875, rather than the grants on which he was actually working.  Relator is also aware of other similar examples involving other researchers at CHEST.

**D.     Scheme 4:  Parsons Incurred Fraudulent, Unnecessary, and Extravagant Expenses That He Charged to His NIH Grants.**

76.     During his tenure as CHEST Director, Parsons frequently charged his NIH grants for unnecessary and/or extravagant travel expenses in violation of NIH rules and regulations.

77.     For example, between 2015 and 2017, Parsons sought reimbursement for $11,400 in three separate "site visits" purportedly in preparation for the GMBS Conference described above.  Not only were these "site visits" unnecessary because they took place in locations at which Parsons had already hosted the GMBS Conferences in prior years, they were social vacations for Parsons and his friends.  Yet, Parsons's costs for these trips were fully reimbursed using funds awarded to CHEST pursuant to NIH grants.

78.    For example, Parsons organized a "Logistical Site Visit" from May 1–7, 2017 for the "4th Bi-Annual International Invited Meeting on Contemporary Issues in Gay Men's Sexual Health Research."  In reality, this "site visit" was an NIH-funded vacation for Parsons to celebrate his 50th birthday, which took place on May 3, 2017, with his friends (most of whom had no role in preparations for GMBS).  Indeed, a spreadsheet that Parsons used to plan for and organize the "site visit" was named "50th Birthday.xlsx." And, on April 24, 2017, Parsons wrote an email to his senior staff and others stating:  "And as a reminder, I'm out all of next week to celebrate turning 50!"

79.    Further, the agenda for this May 2017 "site visit" is comprised of almost all social activities.  For example, the only activities identified on the "Agenda" for May 3, 2017, Parsons' 50th birthday, were a 9:00 a.m. "Site visit to Mantamar Beach Club" and a subsequent "Lunch at Mantamar," followed by a 6:00 p.m. "Evening reception at Mantamar."  The activities on the agenda for the remaining days were of a similar nature.

80.    Parsons also regularly used NIH funds for personal travel for himself and his family or for unreasonably expensive business travel.  This notwithstanding that in nearly all of Parsons's reimbursement/advance requests for travel, he declared the following to RFCUNY:  "Traveler certifies that this request is accurate and correct and that traveler endeavored to obtain best pricing for transportation and lodging expenses," and/or that "travel is necessary for accomplishment of the project," and that "[w]here travel is restricted in grant or contracts this trip conforms with any such restriction of the grant or contract."  These representations were false.

81.    In one particularly egregious instance, on August 6, 2017, Parsons booked one $11,928 refundable round-trip business class ticket on a United Airlines flight from Newark, New Jersey to Capetown, South Africa.  This trip was purportedly to attend the AIDS Impact

Conference 2017 in furtherance of NIH Grant # R01DA036466. On the same day, however, Parsons booked three cheaper business-class tickets on a Delta Airlines flight from Newark, New Jersey to Capetown, South Africa that cost $3,692 each, totaling $11,076. Parsons purchased the two other tickets in the names of his husband and their son. Parsons then cancelled the original United Airlines ticket but used the receipt for that purchase to claim the full $11,928 from RFCUNY to be reimbursed out of a CHEST NIH-funded grant. On information and belief, Parsons retained for himself the extra $852, meaning that through this scheme alone, Parsons stole $8,236 of NIH funds, and flew first class to South Africa with his family.

82.     In addition, Parsons regularly spent excessive sums for ostensibly work-related travel that violated NIH cost guidelines. In fact, Parsons took between 50 and 100 first- or business-class flights between 2011 and 2018 that amounted to hundreds of thousands of dollars in flight expenses paid out of NIH funds. The following are illustrative examples:

> a.     For a March 30–April 7, 2017 trip, Parsons took a $7,345 round-trip United Airlines flight from Newark, New Jersey to Auckland, New Zealand.
>
> b.     For a March 13–18, 2017 trip, Parsons took a $7,215 round-trip United Airlines flight from Newark, New Jersey to Madrid, Spain.
>
> c.     For a November 13–15, 2012 trip, Parsons took a $6,402 round-trip United Airlines flight from Newark, New Jersey to Vancouver, Canada.
>
> d.     For a March 19–21, 2012 trip, Parsons took a $3,659 round-trip United Airlines flight from Newark, New Jersey to Los Angeles, California.

83.     Parsons justified flying first-class by submitting to RFCUNY a supposed doctor's note that documented "back problems." The purported back problem that Parsons used to justify his need for extravagant, luxury travel seems to have been fabricated.

84.     Parsons's many scuba trips between 2013 and 2017 are the best evidence of his fabrication of his "back problems." Not only do these scuba trips belie any claim that Parsons's

"back problems" made economy-class travel problematic, they are also another example of Parsons's theft of money earmarked for scientific research.

85.     Each of the scuba trips Parsons planned were purportedly in furtherance of a "Gay Scuba Week" study, which purported to research how "to better understand how gay men view risk, and how these views relate to caution and thrill seeking" in the context of scuba diving.  But the entire scuba study was bogus.  Instead, the trips were vacations that Parsons took with social acquaintances, with all of Parsons's travel expenses paid out of funds meant to further legitimate research.  On information and belief, no data, findings, or publications have ever been produced for this research, nor was any research ever conducted during these trips.

86.     Parsons traveled for the "Gay Scuba Week" study on the following dates and to the following locations, ultimately seeking reimbursement of a total of $73,451 in travel expenses for the "study" in the years between 2012 and 2018:

      a.    March 24–31, 2012 – Eight-day scuba trip to Honduras.  Parsons sought reimbursement for approximately $3,845 in travel expenses, purportedly for "data collection for SCUBA study."

      b.    February 23–March 2, 2013 – Eight-day scuba trip to the Cayman Islands. Parsons sought reimbursement for approximately $3,824 in travel expenses, purportedly "for recruitment/conducting of SCUBA study (see attached IRB)."

      c.    September 21–28, 2013 – Eight-day scuba trip to Curacao.  Parsons sought reimbursement for approximately $4,978 in travel expenses, purportedly for "Travel to Curacao for Diving for Life 2013."

d.   February 22–March 1, 2014 – Eight-day scuba trip to Maui, Hawaii. Parsons sought reimbursement for approximately $7,026 in travel expenses, purportedly for "Travel to Maui for recruiting/conducting SCUBA study."

e.   September 12–21, 2014 – Ten-day scuba trip to Bonaire in the Caribbean. Parsons sought reimbursement for approximately $7,238 in travel expenses, purportedly for "Travel to Bonaire for Diving for Life."

f.   March 7–14, 2015 – Seven-day scuba trip to Bonaire in the Caribbean. Parsons sought reimbursement for approximately $4,495 in travel expenses, purportedly for "Travel to Bonaire to recruit participants for research study."

g.   June 30–July 11, 2015 – Twelve-day scuba trip to Cuba. Parsons sought reimbursement $10,061 in travel expenses, purportedly for "Travel to Cuba for Ocean Doctor's Educational Trip."

h.   September 27–October 3, 2015 – Seven-day scuba trip to Costa Rica. Parsons sought reimbursement for approximately $5,236 in travel expenses, purportedly for "Travel to Costa Rica to recruit participants for study."

i.   February 25–March 5, 2016 – Nine-day scuba trip to Fiji. Parsons sought reimbursement for approximately $15,110 in travel expenses, purportedly for "Travel to Fiji for research."

j.   February 25–March 4, 2017 – Seven-day scuba trip to Cozumel. Parsons sought reimbursement for approximately $5,384 in travel expenses, purportedly for "Travel to Cozumel for GSW [Gay Scuba Week] for research."

>    k.    October 13–22, 2017 – Nine-day scuba trip to Belize.  Parsons sought
>          reimbursement for approximately $6,073 in travel expenses, purportedly for
>          "Travel to Belize for [Diving for Life]."

87.    On information and belief, the funds with which Parsons was reimbursed for each of the above-listed scuba trips ultimately came out of NIH grant funds.

88.    Even if this study were real, these travel expenses would not have been justifiable, because Parsons did not need to personally attend the trips.  Participants could have been more effectively recruited online (as is standard procedure for Parsons's other studies) and data collection could have occurred by phone or internet (as is also typical for his other studies).

89.    Although this purported scuba study was approved by the CUNY Hunter Internal Review Board ("IRB") once in 2013, Parsons misled the IRB about the study.  Parsons did not disclose that (i) he would be going in person to question study participants, which is generally a task for a junior researcher; and (ii) that the participants would consist entirely of his friends.  Further, the IRB's approval for the study expired in 2013, but Parsons continued to use the expired approval several times over the following years to obtain reimbursement for his travel expenses.

90.    Parsons also regularly claimed reimbursement for personal expenses incurred for his own private contract work invoiced through Mindful Designs, and he often double billed both RFCUNY and the institution for the travel expenses he incurred.  On information and belief, these funds ultimately came from NIH grants.  Several illustrative examples follow:

>    a.    In August 2017, Parsons sought reimbursement from RFCUNY in the
>          amount of $1,726.45 in travel expenses for work on Professor Michael
>          Newcomb's "Chicago 2Gether" project, even though Parsons's work on
>          that project was in furtherance of a contract between Northwestern and

Mindful Designs that paid Parsons $5,000.  In addition, Parsons sought $1,235.98 in reimbursement for travel expenses from Northwestern for the same trip.

b.        In March 2018, Parsons repeated the Chicago 2Gether scheme, invoicing RFCUNY for $2,146.93 for work done on a Mindful Designs contract at Northwestern and then also invoicing Northwestern for $1,411.08 in travel expenses.

c.        Parsons used the same scheme in November 2016 for work performed on a Mindful Designs contract with Oklahoma State University's Center for Integrative Research on Childhood Adversity Center ("CIRCA").  Mindful Designs's $5,000 consulting fee was to include charges for all travel-related costs, but Parsons nevertheless submitted a travel reimbursement to RFCUNY in the amount of $1,589.41 for purported travel expenses.

d.        Parsons repeated the scheme for a March 2017 CIRCA trip, again charging a $5,000 consulting fee on behalf of Mindful Designs that was to include travel-related costs but also submitting a travel reimbursement claim to RFCUNY for $2,021.94.

e.        Parsons again claimed travel expenses from RFCUNY in February 2018, in the amount of $2,938.40 in relation to consulting work he did for the Young Men's Health study at Children's Hospital in Los Angeles, CA, while also seeking reimbursement of $687.10 in travel costs from the Children's Hospital.

91.     Parsons not only purchased unreasonably expensive travel for himself; he also spent excessive amounts on flights for certain CHEST employees.  For example, Parsons authorized purchase and reimbursement of first-class tickets for himself and a junior CHEST employee to attend the 2018 Society of Behavioral Medicine Conference in New Orleans, each costing $1,283, even though other staff members flew to the same conference on economy tickets costing between $400-$500.

92.     Parsons also spent exorbitant amounts of NIH-funds on excessively expensive hotels.  For example, Parsons booked nine standard rooms for CHEST staff members that accompanied him to the 2018 Society of Behavioral Medicine Conference in New Orleans, each costing $236 per night.  Parsons, however, booked a suite at the same hotel for himself at a rate of $350 per night, well above the prescribed rates for conference accommodation by which grant recipients are bound.


## V.     RFCUNY's Role

93.     RFCUNY was the host institution for each CHEST NIH-funded grant for which Parsons was the Principal Investigator.  Therefore, according to NIH regulations, and as RFCUNY itself acknowledges, RFCUNY "stands between CUNY's principal investigators (PIs) and the sponsors who support them," and was responsible for testing "controls that ensure efficiency, effectiveness, and adherence to established rules and regulations."  As alleged, those NIH regulations impose stringent requirements for institutions such as RFCUNY to serve as watchdogs over their investigators' FCOIs and the reasonableness of their incurred costs. But RFCUNY utterly failed in meeting these obligations.

94.     Rather than risk alienating a star researcher who procured substantial grant funds and the prestige that went along with them, RFCUNY provided no meaningful oversight and never sought to meaningfully police Parsons's administration of his NIH grants. RFCUNY either knew or was reckless in failing to uncover critical aspects of Parsons's wide-ranging fraud and did almost nothing to stop it.

95.     For example, based on all the information RFCUNY had, it could have (and indeed may have) easily discovered that Parsons fraudulently failed to disclose his ownership interest in Mindful Designs on his annual conflict of interest forms.  Such substantial contracts to a graphic design company should have triggered an inquiry into the ownership of the entity that was receiving such a significant share of NIH grant funds.

96.     RFCUNY also knew (or was reckless in failing to discover) that Mindful Designs (which RFCUNY *at least* knew was owned by Parsons's husband) was submitting inflated and double invoices for projects.  That Parsons or his program were paying large invoiced amounts to a graphic design company that Parsons co-owned (or even that his spouse owned) should have raised clear red flags to an entity in RFCUNY's position, and it gave rise to a duty to investigate and impose controls to prevent and mitigate the fraud.  RFCUNY's failure to do so was, at the very least, reckless.

97.     For example, as reproduced above, Parsons sought authorization from RFCUNY to spend $465,400 of NIH grant money for one year of graphic design services from Mindful Designs. A request of close to half a million dollars for graphic design assistance for a research program is facially excessive, even if one disregards that the design firm was owned by the Principal Investigator (or even just his spouse, a fact that was patently clear from the forms Parsons submitted directly to RFCUNY).

98.     To cite another example, on January 23, 2014, Parsons submitted a "Payment Request" in the name of Mindful Designs to RFCUNY in the amount of $11,500 for work over the two-month period between November 1, 2013 and December 31, 2013. This Payment Request should have set off alarms causing RFCUNY to withhold payment and investigate Parsons's conduct. Once again, the amount being requested—$11,500 for two months of graphic design work being paid to the company owned by the Principal Investigator—is an excessive amount that should have triggered meaningful review.

99.     Indeed, RFCUNY frequently turned a blind eye to out-of-control spending by Parsons, one of its star researchers. By way of example, and as alleged above, substantial evidence supports the inference that:

      a.      RFCUNY authorized payment of at least seventy-one Mindful Designs invoices for purported graphic design work over a seven-year period totaling close to $500,000;

      b.      RFCUNY repeatedly authorized payment of multiple Mindful Designs invoices for the same GMBS Conference—invoices that totaled at times over $10,000—in connection with graphic design work purportedly done in connection with exotic invited conferences at beachside resorts at which many attendees were close friends with Parsons.

      c.      RFCUNY authorized reimbursement to Parsons of $11,400 for three "site visits" undertaken purportedly in preparation for GMBS Conferences and at which the entire agenda was focused almost wholly on entertainment, drinking, and eating, and at which all attendees were again close friends with Parsons.

      d.      RFCUNY authorized reimbursement to Parsons for travel expenses for eleven scuba diving trips to exotic locales.

      e.      RFCUNY authorized reimbursement to Parsons for excessive airfare, including separate international flights in the amounts of $11,928, $8,932, $7,215, and $6,402.

## VI.    Parsons's Collaborators and Co-conspirators

### A.  Chris Hietikko

100.    As alleged above, Hietikko was the co-owner of Mindful Designs and was fully involved in nearly all of the fraudulent activity alleged above.  Hietikko either participated or was at least aware that Mindful Designs was double (and triple) billing programs funded by NIH grants. Hietikko knew that Mindful Designs was charging those NIH grants excessive rates for services that Mindful Designs often did not even perform.  And, Hietikko knew that Parsons sought and received grant funds on CHEST grants that included work for Mindful Designs that Parsons would not have sought had it not directly benefited him.

### B.  Brian Mustanski, Jarret Thompson, & Jarret Thompson Consulting

101.    Mustanski is the Director of the Institute for Sexual and Gender Minority Health and Wellbeing at Northwestern University, as well as the Co-Director of the NIH Third Coast Center for AIDS Research, and the Co-Director of the NIDA Center for Prevention Implementation Methodology.  Mustanski has to date received over $40,000,000 in federal and foundation grants.  Thompson is Mustanski's husband and, on information and belief, is the owner of Jarret Thompson Consulting.

102.    Through Jarret Thompson Consulting, Mustanski and Thompson undertook schemes nearly identical to those orchestrated by Parsons and Hietikko through Mindful Designs.

103.    For example, Mustanski and Parsons co-hosted the four GMBS Conferences previously addressed, and Mustanski, Thompson, and Jarret Thompson Consulting engaged in the very same scheme that Parsons, Hietikko, and Mindful Designs executed as to those conferences. Specifically, Jarret Thompson Consulting separately invoiced CHEST and Parsons (at Hunter College) a total of $9,500 for work in preparation for the 2016 GMBS Conference, one via an invoice to Parsons on June 1, 2015 in the amount of $4,500, and another via an invoice to CHEST on January 26, 2016 in the amount of $5,000.

104.    In addition, there is evidence that Mustanski and Parsons conspired with each other to hire as consultants their respective husband's companies (and Parsons's company) to perform work to be paid for with NIH funds.  As alleged above, one of Mindful Designs's three invoices for the 2014 and 2016 GMBS Conferences was directed to Mustanski.  By all accounts, these contracts were of a similarly fraudulent nature as those entered into between Mindful Designs and CHEST.  For example, Parsons was named as "Site PI" on a Northwestern University grant, NIH Grant # U01MD01128031, for which Defendant Mustanski was the Principal Investigator.  This grant paid Parsons, through Mindful Designs, a total of $261,000 between 2016 and 2017.  In that same period, Mindful Designs also issued at least 14 invoices to Northwestern for a total of $103,500 for video, production, and/or photography related work purportedly performed by Hietikko.

105.    Further, the scope of work that Jarret Thompson Consulting described with respect to the 2016 GMBS Conference appears nearly identical to the work that Mindful Designs contended it performed in its invoices to CHEST and to Mustanski at Northwestern, *i.e.*, "Create online registration form for participants and coordinate registration for all conference attendees."

106.   And, as alleged above, Jarret Thompson Consulting also had a role in the planning of at least one of the GMBS Conference "site visits."

**C. Sylvie Naar and Behavior Change Consulting**

107.   Parsons also appears to have engaged in fraudulent dealing with Defendant Dr. Sylvie Naar, who has been since early 2018 a Distinguished Endowed Professor in Behavioral Health at Florida State University ("FSU") Medical School's Department of Behavioral Sciences and Social Medicine and the head of FSU's Center for Translational Behavioral Research. Previously, Naar was a researcher at Wayne State University from as early as 2004. Naar purports to be an expert grant writer and has earned over $17,000,000 in grants and contracts. Naar is the founder of a company called Behavior Change Consulting and was until very recently its owner. Naar and Parsons have been close acquaintances for years and have worked together since at least 2004.

108.   Substantial evidence supports the inference that Parsons has conspired with Naar to engage in schemes similar to those alleged above.

109.   For example, in 2017, Naar and Parsons conspired to siphon NIH grant funds to Behavior Change Consulting from a grant on which Naar was the Principal Investigator while at Wayne State University, NIH Grant # R01AA022891. Specifically, Naar subcontracted with CHEST on the grant, which allowed Parsons to authorize, through CHEST, another contract back to Behavior Change Consulting worth $10,000. Through this arrangement, Naar personally was able to fraudulently obtain that $10,000 in funds from her own NIH grant. On information and belief, Naar did this so that she would not have to directly account for her conflict of interest.

110.    Further, Naar sought to repeat this arrangement with CHEST in 2018, but to increase the value of the Behavior Change Consulting contract from $10,000 to $15,000, though her request was ultimately declined.

111.    On information and belief, Naar had also engaged in this same scheme in several years prior, and Parsons assisted Naar's self-dealing so that she would return the favor and give contracts to Mindful Designs on her grants.

## CLAIMS

### COUNT I – VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)
### Against All Defendants

112.    Relator incorporates all of the preceding paragraphs as if fully set forth herein.

113.    Through the acts alleged in this Complaint, each Defendant knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

### COUNT II - VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)
### Against All Defendants

114.    Relator incorporates all of the preceding paragraphs as if fully set forth herein.

115.    Through the acts alleged in this Complaint, each Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

## COUNT III - VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)
#### Conspiracy
#### Against All Defendants

116.    Relator incorporates all of the preceding paragraphs as if fully set forth herein.

117.    Through the acts alleged in this Complaint, Parsons, Hietikko, Mindful Designs, RFCUNY, Mustanski, Thompson, Jarret Thompson Consulting, and Naar conspired between and amongst themselves to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) & (B) in violation of 31 U.S.C. § 3729(a)(1)(C).

### PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, respectfully requests that judgment be entered in its favor and against Defendants as follows:

a)      On the first cause of action, for three times the amount of damages that the government sustained because of the acts of each Defendant to be determined at trial, plus penalties, costs, interest, and attorneys' fees.

b)      On the second cause of action, for three times the amount of damages that the government sustained because of the acts of each Defendant to be determined at trial, plus penalties, costs, interest, and attorneys' fees.

c)      On the third cause of action, for three times the amount of damages that the government sustained because of the acts of each Defendant to be determined at trial, plus penalties, costs, interest, and attorneys' fees.

d)      Relator is to receive the maximum amount permitted by law of the proceeds of this action or settlement of the claims, as well as expenses Relator has necessarily incurred, plus attorneys' fees and costs, under 31 U.S.C. § 3730(d).

e)      For an award of such other and further relief as this Court deems proper as a matter of law and/or under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

Dated: New York, New York
      August 16, 2019

Sean Hecker
Jenna M. Dabbs
Benjamin D. White
Alexandra K. Conlon (*admission pending*)
KAPLAN, HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
bwhite@kaplanhecker.com
aconlon@kaplanhecker.com

*Attorneys for Relator Devin English*